IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CLAUDIA INGLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 14-cv-413-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Claudia Ingle, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Ms. Ingle applied for benefits in January, 2008, alleging disability beginning on October 31, 2006.   That application was denied after a hearing.   (Tr. 716-725). After the denial became the final decision subject to judicial review, plaintiff filed suit in this district.   The ALJ's decision was reversed and remanded.   See, *Ingle v. Astrue*, Case No. 10-1002-DRH.

In the meantime, plaintiff filed a second application for DIB in June 2010. The Appeals Council directed the ALJ on remand to address both applications in

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 20.

his decision on remand.   (Tr. 709).

After further proceedings, ALJ Michael Scurry denied the application in a decision dated September 6, 2012.   (Tr. 623-636).   That decision is now subject to judicial review.   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1.   The ALJ erred in weighing the opinion of treating psychiatrist, Dr. Qureshi.

2.   The ALJ erred in evaluating plaintiff's mental residual functional capacity.

3.   The ALJ erred in assessing plaintiff's credibility.

### Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   In this context, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20

C.F.R. §§ 404.1572.

In a DIB case, a claimant must establish that she was disabled as of her date last insured. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Ingle was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).   This Court uses

the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above. He determined that Ms. Ingle had not been engaged in substantial gainful activity since the date of her application. She was last insured for DIB as of December 31, 2011.

The ALJ found that plaintiff had severe impairments of bipolar disorder, depression, personality disorder and generalized anxiety disorder. He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Ingle had the residual functional capacity (RFC) to perform work at all exertional levels, limited to simple, routine, repetitive tasks; no more than average production standards; and only occasional contact with others. Based upon the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work, but she was not disabled because she was able to do other jobs that exist in significant numbers regional and national economies.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

This Court reviewed the record as it existed at the time of the first ALJ decision in a Report and Recommendation dated October 28, 2011.   See, Case No. 10-1002-DRH, Doc. 20.   The Court will not repeat all of that material here.

1.    **Agency Forms**

Plaintiff was born in 1950 and was almost 56 years old on the alleged onset date of October 31, 2006.   (Tr. 115).   In a Disability Report filed in connection with her second application, she stated that she was unable to work because of bipolar disorder, anxiety and depression.   (Tr. 850).   She also stated that Dr. Qureshi had told her that stress was likely to cause her condition to worsen and to require hospitalization.   Dr. Qureshi had "asked me not to work as he feels any work causes stress."   (Tr. 857).

Plaintiff alleged difficulties with concentration and memory.   (Tr. 864).

Plaintiff had previously worked as an office manager and as a terminal manager for a trucking company.   (Tr. 878).

2.    **Evidentiary Hearings**

Ms. Ingle was represented by an attorney at both evidentiary hearings.   (Tr. (Tr. 30, 648).

The first hearing was held in February 2010.   The second hearing was held

in August 2012.   At this hearing, ALJ Scurry referred to an earlier hearing that had been held on plaintiff's second application.   This hearing took place in March 2012, before the Appeals Council directed him to consolidate the second application with the remand of the first application.   The transcript of the March hearing was not filed with the administrative record in this Court.

At the first hearing, Ms. Ingle testified that she stopped working on October 31, 2006, when she and her husband moved from Mattoon, Illinois.   Her husband took a job transfer in part because she was having problems at work.   She applied for jobs in accounting and office management positions after they moved, but she was not hired.   She quit applying because, after they traded in their car, it upset her so much just to drive a different car that she felt she would not be able to work. (Tr. 46).

Psychologist Betty J. Feir, PhD, testified as a medical expert at the first hearing.   She stated that plaintiff had a moderate limitation in maintaining concentration, persistence and pace.   (Tr. 36).

At the second hearing, plaintiff again stated that her husband requested a transfer because plaintiff was "having so much trouble" with her job.   She was taking medication for depression and anxiety.   Her new doctor changed her medication, which caused a "total breakdown."   She was hospitalized at Mulberry Center.   Dr. Qureshi became her psychiatrist.   He tried changing her medication from time to time, but it was always unsuccessful.   Ms. Ingle testified that her medication made her sleep a lot and gain weight.   She applied for some jobs in 2008.   When he learned this, Dr. Qureshi told her that he did not want her to try to

work because work caused stress, and she would probably wind up back in Mulberry Center again.   (Tr. 657-659).

Ms. Ingle said she slept 12 hours a night and also slept during the day.   She had a sleep study, and she did not have sleep apnea.   Her excessive sleep was related to her medication.   (Tr. 664-664).

Plaintiff's mother lived with her for a while.   Her mother paid rent and helped out around the house.   She had Alzheimer's, and they had to put her in a nursing home.   She passed away a couple of years before the hearing.   (Tr. 659).

A vocational expert also testified.   The ALJ asked him a hypothetical question that corresponded to the ultimate RFC findings.   The VE testified that this person could not do plaintiff's past work.   However, she was able to do other jobs that exist in significant numbers in the national and regional economies. Examples of such jobs are janitorial cleaning positions at the light and medium exertional levels.   (Tr. 674-675).

If the person also had a marked limitation, as defined in Dr. Qureshi's report, in ability to maintain concentration, persistence and pace, and in ability to maintain social functioning, she would not be able to engage in gainful activity. (Tr. 676-677).

### 3.   Medical Records

In April 2007, plaintiff told a psychiatrist in Paducah, Kentucky, that her husband did not believe that she was depressed.   The doctor saw her with her husband in May 2007.   Her husband stated that she no longer had patience.   (Tr. 316).   She was hospitalized on May 31, 2007, after she was up sobbing all night

and planning a drug overdose.   Her husband stayed up with her.   (Tr. 317).

Dr. Qureshi, a psychiatrist, first saw plaintiff during her hospitalization. He noted that she had "moved to Herrin about 1½ years ago and began taking care of her mother."   (Tr. 307).

From June 2007 through April 2008, Dr. Qureshi saw plaintiff twelve times. He noted mild limitations in concentration or memory on two visits (Tr. 950, 956) and moderate limitations in concentration once (Tr. 944). No limitations in these areas were noted on the rest of the visits.   Her GAF was assessed at 60 or 65 except for the last visit, when it was 50.   The diagnosis was bipolar disorder.   (Tr. 939-971).

From June 2008 through April 2009, Dr. Qureshi noted continuing paranoia.   He documented mild impairment of attention and concentration, and he assessed her GAF at 45.   Her medications were adjusted.   On June 5, 2008, Abilify was discontinued and Zyprexa was started.   (Tr. 472-480).

On June 13, 2008, plaintiff was seen by a counselor on Dr. Qureshi's referral.   She told the counselor that that she had moved to southern Illinois in November, and then had a "nervous breakdown" for which she was hospitalized. She was unable to return to work.   She identified her primary stressor as "dealing with SSD denial."   She said that her anxiety had been severe and constant before her medication was changed from Abilify to Zyprexa.   The Axis I diagnosis was bipolar with anxiety disorder.   Her GAF was assessed at 41.   (Tr. 525).

On July 6, 2009, Dr. Qureshi noted that plaintiff seemed to be more depressed.   Her mother was in a nursing home.   He assessed her GAF at 65 and

noted mild impairment in attention and concentration.   (Tr. 1000-1001).

On July 31, 2009, Dr. Qureshi completed a Mental Impairment Questionnaire.   (Tr. 566-571).   He indicated that her current GAF was 45, and that her highest GAF in the past year was 65.   He assessed her as "seriously limited, but not precluded" in each of 16 enumerated mental abilities and aptitudes, including "make simple work-related decisions" and "ask simple questions or request assistance."  (Tr. 568).   He indicated that she had marked limitation in the functional areas of activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace.   He said that she had 3 episodes of decompensation in the last 12 months.   (Tr. 570).   Dr. Qureshi did not complete the part of the form which asked for the dates of the episodes of decompensation.   (Tr. 570).

The next visit was on December 15, 2009.   Plaintiff's mother had died. Plaintiff complained of medication side effects of weight gain and excessive sleep. Dr. Qureshi assessed her GAF at 60 and again noted mild impairment in attention and concentration.   She was to continue taking Zyprexa, Klonopin and Effexor. (Tr. 1002-1003).   The assessment was the same in April and July 2010.   (Tr. 1004-1007).

On November 1, 2010, Ms. Ingle complained to Dr. Qureshi of excessive sleep and weight gain.   He noted that she was depressed and had lost her disability claim.   He assessed her GAF at 50 and again noted mild impairment in attention and concentration.   (Tr. 1077-1078).

In December 2010, Ms. Ingle was 5'5" tall and weighed 186 pounds.   (Tr.

1036).

The next office note from Dr. Qureshi is dated November 8, 2011.   She said she was feeling "about the same."   Dr. Qureshi noted a full range of mood.   She was able to stay focused during the session, and her cognition "appears to be grossly intact and at a baseline level.   Insight and judgment were good.   She was continued on the same medications.   Her GAF was assessed at 50.   The diagnoses were bipolar disorder NOS, anxiety disorder NOS, and personality disorder NOS. (Tr. 1170-1172).

Plaintiff was last insured for DIB on December 31, 2011.

On January 18, 2012, Ms. Ingle told her primary care physician that her bipolar symptoms were "well controlled with current medications."   (Tr. 1188).

In April 2012, Dr. Qureshi noted findings similar to the November 2011 exam.   He assessed her GAF at 60 on this visit.   (1177-1179).

**4.     State Agency Consultant's RFC Assessment**

On April 6, 2008, Margaret Wharton, Psy.D., assessed plaintiff's mental RFC. She used an agency form (Form SSA-4734-F4-SUP) that is commonly used for this purpose in social security cases.   (Tr. 449-452).   This form is referred to as the Mental Residual Functional Capacity Assessment.   Section I of the form consists of a list of mental activities.   The consultant is asked to set forth her "summary conclusions" by checking a box to rate the severity of limitation as to each activity. Dr. Wharton checked the box for "moderately limited" for the following activities:

- Ability to understand and remember detailed instructions;

- Ability to carry out detailed instructions;

- Ability to maintain attention and concentration for extended periods.

She indicated that plaintiff was "not significantly limited" in all other areas of functioning.

In Section III of the form, the consultant is directed to explain her "summary conclusions in narrative form.   Include any information which clarifies limitation or function."   Here, Dr. Wharton wrote that plaintiff's "cognitive and attentional skills are intact and adequate for simple one-two step work tasks.   CT [claimant] performs well on cognitive tasks on MSE [mental status exam]."   She also noted that plaintiff carried out "a fair range of daily activities," was "okay" at following spoken directions, but not as good at following written instructions.   Her depressive symptoms "moderately limit ability to carry out detailed tasks."   She also noted that plaintiff's interpersonal and adaptive skills were within normal limits.

After remand, a different state agency consultant completed a Psychiatric Review Technique Form indicating that Ms. Ingle had no severe mental impairments.   (Tr. 1012-1025).   He did note that her concentration was "somewhat slowed."   (Tr. 1024).   A second Mental Residual Functional Capacity Assessment was not prepared.

## Analysis

Ms. Ingle's first point regarding the weight given to Dr. Qureshi's opinion is not well-taken.

The ALJ compared Dr. Qureshi's opinion as set forth in his report with his office notes, and gave "less weight" to his report than to his treatment notes.   (Tr.

632-633).   Plaintiff argues that the ALJ should have given the report "great weight."

The opinions of treating doctors are to be evaluated under 20 C.F.R. §404.1527.   Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability."   *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).   If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.   Supportability and consistency are two important factors to be considered in weighing medical opinions.   See, 20 C.F.R. §404.1527(d).   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."   *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he may "bend over backwards" to help a patient obtain benefits.   *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). See also, *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds no error in the ALJ's weighing of Dr. Qureshi's opinion.   The ALJ correctly concluded that Dr. Qureshi's office notes for the relevant period do not support the severe mental limitations set

forth in his July 2009 report.

Dr. Qureshi checked boxes to indicate that Ms. Ingle was "seriously limited, but not precluded" from doing a number of listed "mental abilities and aptitudes needed to do unskilled work."   The list includes things such as ability to understand and remember very short and simple instructions and ability to maintain attention for two-hour segments.   The doctor could have, but did not, rate plaintiff as "unable to meet competitive standards" or "no useful ability to function" in these areas.   (Tr. 568-569).   On the next page of the form, the doctor checked boxes to indicate that plaintiff had "marked" limitations in activities of daily living, maintaining social functioning, maintaining concentration persistence and pace.   The ALJ found this to be inconsistent.   See, Tr. 632.   Plaintiff argues that there was no inconsistency because the form that the doctor filled out defined the terms in a similar way.

The form that Dr. Qureshi filled out is not an agency form.   It appears to have been furnished to the doctor by the attorney who represented plaintiff at the administrative level.   The form is not a model of clarity.   Plaintiff's argument focuses on the somewhat convoluted definitions set forth in the form.   In doing so, she misses the ALJ's larger point, which is that Dr. Qureshi declined to find that plaintiff was "unable to meet competitive standards" in any category.

Plaintiff also argues that the ALJ cherry-picked Dr. Qureshi's notes in concluding that his treatment notes do not support his opinion.   She is incorrect. ALJ Scurry considered the full range of GAF scores assessed by Dr. Qureshi, and also correctly noted that he documented generally routine visits for medication

refills with benign findings on mental status exam.  The ALJ is correct.  While plaintiff argues that Dr. Qureshi documented impairments in memory and concentration, Dr. Qureshi's notes documented only mild impairments in those areas, except for one finding of moderate impairment in concentration.

Plaintiff has not demonstrated that the ALJ erred in weighing Dr. Qureshi's opinion.   At best, she demonstrates that his opinion could be weighed differently. However, it is not this Court's function to reweigh the evidence.  *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015), citing *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

The Court agrees with plaintiff's second point.   The ALJ gave "strong consideration" to the Mental RFC assessed by Dr. Wharton.   However, he discussed only the findings set forth in Section III of the form.   See, Tr. 631.   In Section I of the form, Dr. Wharton found that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods.   (Tr. 449). Similarly, at step 3 of the sequential analysis, the ALJ found that plaintiff was moderately limited in concentration, persistence or pace.   See, Tr. 627.

Plaintiff correctly argues that a limitation to simple, routine and repetitive tasks does not adequately account for a moderate limitation in maintaining concentration, persistence or pace.   She cites *O'Connor–Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), in support.

Defendant argues that the ALJ sufficiently accounted for plaintiff's moderate impairment by limiting her to work that requires no more than average production requirements.   See, Doc. 39, p. 7.   However, the Seventh Circuit had held that a

similar limitation to no "fast paced production requirements" does not adequately capture difficulties in maintaining concentration, persistence and pace. *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015)

Defendant also argues that the ALJ was not required to include a limitation in concentration, persistence or pace in his RFC assessment because Dr. Wharton explained in Section III of the Mental RFC Assessment form that this limitation restricted plaintiff's ability to carry out detailed tasks. Doc. 39, p. 8. However, the Seventh Circuit has repeatedly rejected the argument that a limitation to unskilled work or simple, one to two steps tasks adequately accounts for a limitation in maintaining concentration, persistence or pace. *Varga v. Colvin*, 794 F.3d at 814; *Yurt v. Colvin*, 758 F.3d 850, 858 (7th Cir. 2014); *O'Connor-Spinner*, 627 F.3d at 620, and cases cited therein.

In fact, the ALJ did not discuss the Section I findings at all. "Worksheet observations [i.e., Section I findings], while perhaps less useful to an ALJ than a doctor's narrative RFC assessment, are nonetheless medical evidence which cannot just be ignored. True, in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations." *Varga v. Colvin*, 794 F.3d at 816.

*Varga* was decided on July 24, 2015, well before defendant filed her brief in this case. She did not cite *Varga* in her brief. The Commissioner's argument here glosses over the Seventh Circuit's clear statement that worksheet observations constitute medical evidence that cannot simply be ignored. Further, she pays insufficient attention to the Seventh Circuit's admonition that the ALJ can rely on

the narrative statement in Part III only where it "adequately encapsulates and translates" the worksheet observations.   Her argument is that Dr. Wharton "translated" her worksheet finding into a narrative assessment by stating that plaintiff is limited to simple tasks.   Again, this position has repeatedly been rejected by the Seventh Circuit.   A limitation to simple, routine, repetitive tasks speaks only to the difficulty of learning the task in the first place, and does not adequately capture a moderate limitation in concentration, persistence or pace. *Varga v. Colvin*, 794 F.3d at 814; *Yurt v. Colvin*, 758 F.3d at 858; *O'Connor-Spinner*, 627 F.3d at 620, and cases cited therein.

*Varga* cites *Yurt,* which was decided in 2014.   In *Yurt*, the   Seventh Circuit rejected the Commissioner's argument that the ALJ may ignore Part I of the Mental RFC Assessment form and consider only the narrative statement in Part III.   *Yurt*, 758 F.3d at 858-859.   Without citing either *Varga* or *Yurt*, the Commissioner is implicitly making the same argument here.

This is not to say that ALJ Scurry was bound to accept Dr. Wharton's conclusions.   The ALJ is required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider the state agency consultant's findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision.   See, *McKinzey v. Astrue*, 641 F.3d 884, 891(7th Cir. 2011).

The ALJ who first denied plaintiff's application included in his hypothetical question a moderate limitation in attention, concentration and pace.   (Tr. 52).

ALJ Scurry, although he found at Step 3 that plaintiff was moderately limited in maintaining concentration, persistence and pace, did not include it in either his RFC assessment or in a hypothetical question.   The Commissioner's argument that the limitations to simple, routine work and to no more than average production requirements adequately capture moderate limitations in concentration, persistence and pace are contrary to binding precedent.   Therefore, this Court must conclude that the ALJ erred in assessing plaintiff's RFC.

Under the binding precedents of *Yurt* and *Varga*, this Court must conclude that the ALJ failed to build "an 'accurate and logical bridge' between the evidence of mental impairments and the hypothetical and the mental RFC."   *Yurt*, 758 F.3d at 858-859.   Therefore, this case must be remanded.

Because remand is required, the Court will not undertake a detailed analysis of plaintiff's argument regarding the credibility analysis.   However, in her brief, the Commissioner implicitly concedes that plaintiff correctly contends that the ALJ was mistaken as to the reason her job ended and he erred in his analysis of the fact that plaintiff's husband did not initially believe she was depressed.   See, Doc. 39, p. 11.

Lastly, the Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Ingle was disabled during the relevant period, or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying Claudia Ingle's application for

social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   January 22, 2016.**


<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**